## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA, THE
STATES OF CALIFORNIA, FLORIDA,
GEORGIA, MARYLAND,
MASSACHUSETTS, MINNESOTA, NEW
JERSEY, NEW MEXICO, NEW YORK,
NORTH CAROLINA, RHODE ISLAND,
TENNESSEE, VIRGINIA *ex rel.* STEPHEN
EIMERS,

        Plaintiffs,

  v.

LINDSAY CORPORATION, SAFE
TECHNOLOGIES, INC., LINDSAY
TRANSPORTATION, INC., BARRIER
SYSTEMS, INC., VALMONT
CORPORATION, VALMONT
TRANSPORTATION, ARMORFLEX
CORP.,

        Defendants.

Case No:

1:19-CU-286 (MAD/CFH)

**FILED *IN CAMERA* AND
UNDER SEAL**

**DO NOT ENTER INTO PACER**

---

### FALSE CLAIMS ACT COMPLAINT

On behalf of the United States of America, the states of California, Florida, Georgia,

Maryland, Massachusetts, Massachusetts, Minnesota, New Jersey, New York, North Carolina,

Rhode Island, Tennessee, Virginia and the Plaintiff and Relator Stephen Eimers ("Mr. Eimers"

or "Relator") files this *qui tam* complaint against Defendants Lindsay Corporation, Safe

Technologies, Inc., Lindsay Transportation, Barrier Systems, Inc., Valmont Corporation,

Valmont Transportation, and ArmorFlex Corp. ("Defendants") under the False Claims Act, 31

U.S.C. § 3729 *et seq.* (the "FCA"), the False Claims Acts of the states described herein, and

allege as follows:

## I.     INTRODUCTION

1.     Defendants collectively manufacture, market, sell, have run crash tests and have sought approval for federal funding for the X-Lite End Terminal for use on federal and state highways.

2.     This action is a result of (a) Defendants' knowingly presenting, or causing to be presented, false claims for payment and approval for the X-Lite End Terminal to the United States and to the states named herein as Plaintiffs, and (b) Defendants' knowingly making, using or causing to be made or used, a false record or statement concerning the X-Lite End Terminal in order to get a false or fraudulent claim paid or approved by the United States and the states named herein as Plaintiffs.

3.     Defendants knowingly and intentionally put motorists at serious risk of harm, and motorists have been harmed, by the X-Lite Terminal, which Defendants knew was defective. Despite this knowledge, Defendants withheld information about the X-Lite's defects and about undisclosed changes to the X-Lite while seeking approvals and when making or causing to be made false claims for payment for the X-Lite Terminal from the United States and the states named herein as Plaintiffs.

4.     As a result of Defendants' fraud, dozens of motorists have been killed, maimed or seriously injured, while federal and state governments have been defrauded out of hundreds of millions of dollars.

5.     At least 12 states[1] have removed the X-Lite Terminal Heads from their roadways because it is unsafe and all states have removed the X-Lite Terminal Head from their Approved Products lists.

---

[1]     Tennessee, New York, Maine, Vermont, New Jersey, Rhode Island, Connecticut, Maryland, Pennsylvania, Missouri, Nebraska and Illinois have removed the X-Lite

6.      Senior state officials and Department of Transportation officials in multiple states have expressed concern about the safety record and in-service performance of the X-Lite Terminal Head.  For example, the attached (Exhibit A) is a letter from the Tennessee Department of Transportation outlining their concerns about the X-Lite.  And Exhibit B is a press release and legislation from New York state officials mandating that the X-Lite be removed from New York's roadways due to its poor performance and safety concerns.

7.      However, as evident in this action, Defendants continue to elect corporate revenue over safety.  This civil action seeks to hold Defendants responsible for their fraudulent and harmful behavior.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 31 U.S.C. § 3732 and concurrent jurisdiction over state law claims because those claims arise from the same transaction or occurrence giving rise to the claims brought under the FCA.

9.      Additionally, pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular the FCA.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the remaining claims on the grounds that those claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.     At all relevant times, Defendants regularly conducted substantial business within the state of New York, and made, and are making, significant sales and claims for

---

completely from their roadways, while Virginia has removed the X-Lite from roads with speed limits of 55 mph or more.  Based upon conversations with Texas DOT officials, Texas is also considering removing the X-Lite from its roads.

reimbursement in the state of New York, within this judicial district, including claims directly related to the claims in this action.

11.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), which provides that any action brought under § 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant, can be found, resides, transacts business, or in which any act proscribed by § 3729 occurred. The acts complained of herein occurred in the state of New York within this judicial district, as well as nationwide. Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

## FILING UNDER SEAL

12.     Under the FCA, as well as the False Claims Acts of states pleaded herein, pleadings are to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders.

13.     As required by 31 U.S.C. § 3730(b)(2), Relator voluntarily submitted prior to the filing of this Complaint a confidential written disclosure statement (subject to the attorney-client privilege) to the United States Government, containing materials, evidence, and information in its possession pertaining to the allegations contained in the this Complaint. Relator also voluntarily submitted a confidential written disclosure statement and this Complaint to the states under whose FCAs this action is partially brought.

## II.    THE PARTIES.

14.     **Relator/Plaintiff:** Mr. Eimers is a small-business owner and resident of Lenoir City, Tennessee. Relator is the original source of the facts and information hereinafter set forth concerning the activities of the Defendants relative to the X-Lite guardrail terminal being manufactured and sold by Defendants, which are improperly being sold to states under federal and state highway reimbursement programs. The facts averred herein are based upon the

4

personal observations of Mr. Eimers, his personal and extensive review of documents and information he has gathered from multiple sources, including from state and federal officials, contractors and Defendants, along with Mr. Eimers' meticulous investigation of the roadside hardware actually installed by Defendants in the form of the X-Lite end terminal on roads throughout the United States, after the death of his daughter as a result of a collision with an X-Lite terminal. Mr. Eimers discovered undisclosed modifications and changes to the X-Lite by (1) comparing the X-Lites on the road throughout the country with the photos, descriptions and videos of the X-Lite terminals tested in 2010 by Lindsay to gain federal approval for the X-Lite, and by (2) comparing Lindsay's X-Lite installation instructions with the photos, videos and descriptions of the testing installations provided by Lindsay to the FHWA in 2010 in order to gain federal approval for the terminal.

**DEFENDANTS**

15.    Lindsay Corporation, 2222 North 111th Street, Omaha, NE 68164, the current trademark owner and manufacturer of the X-Lite.

16.    Safe Technologies, Inc., 170 River Road, Rio Vista, CA 94571, Lindsay's wholly owned subsidiary that did all of the reported crash testing on the X-Lite.

17.    Lindsay Transportation of 180 River Road | Rio Vista, CA 94571, a subsidiary of Lindsay Corporation and the manufacturer of the X-Lite.

18.    Barrier Systems, of 180 River Road | Rio Vista, CA 94571, upon information and belief, a marketing and sales corporation for the X-Lite which has now merged with Lindsay Corporation. Barrier Systems sought FHWA approval for changes made to the X-Lite in 2013.

19.    Valmont Corporation/Valmont Transportation, Omaha, Nebraska, upon information and belief, purchased patent from ArmorFlex Corp. in 2013.

20.     ArmorFlex Corporation, New Zealand, original patent owner of the X-Lite and the entity that first requested that the FHWA review crash test results of the X-Lite in 2010 in order to obtain eligibility for use on federal highways.

### III.    THE FEDERAL AID HIGHWAY PROGRAM.

23     The Federal Highway Administration (FHWA) supports State and local governments in the design, construction, and maintenance of the Nation's highway system (Federal Aid Highway Program) and various federally and tribal owned lands (Federal Lands Highway Program). State and local governments construct and maintain the highways, but the FHWA provides oversight and funding.

24     The FHWA will reimburse States for the installation of roadside safety devices, including guardrail end terminals, only if the devices meet applicable crash test criteria.  As a service to the states, the FHWA provides technical assistance to evaluate the crashworthiness of roadside safety hardware and by writing corresponding Federal-aid reimbursement eligibility letters if the FHWA deems the roadside safety hardware to be crashworthy under the applicable standards.

25     "The Federal share payable on account of any project [on the interstate highway system] for . . . installation of traffic signs, traffic lights, guardrails, impact attenuators, concrete barrier end treatments . . . may amount to 100 percent of the cost of construction of such projects" as long as such projects are not more than 10 percent of "all Federal-aid programs for any fiscal year." 23 U.S.C.A. § 120(c)(1).

26     Guardrail terminal-head systems, such as the X-Lite system, are defined in federal law and in DOT regulations as **"innovative crashworthy safety barriers" and "positive protective devices"**, which are safety barriers that been shown to the FHWA to "meet or surpass[] the requirements of the National Cooperative Highway Research Program 350 ("NCHRP Report 350")".

27     Under Chapter I of the laws governing the Department of Transportation's Federal-Aid Highways, an "**innovative crashworthy safety barrier**" is defined as a "barrier, other than a

6

guardrail or guiderail . . . that meets or surpasses the requirements of the National Cooperative

Highway Research Program 350 [NCHRP Report 350] for longitudinal barriers." 23 U.S.C. §

109(c).

28      Section 109 also requires that "Not less than 2 ½ percent of the mileage of new or

replacement permanent or temporary crashworthy barriers included in awarded contracts along

Federal-aid highways within the boundaries of a State in each calendar year shall be **innovative**

**crashworthy safety barriers**." 23 U.S.C. § 109(a). Each state must "annually certify to the

Secretary [of Transportation] its compliance with the requirements of this section." *Id.*

29      Under Federal Highway Administration's ("FHWA") regulations, 23 C.F.R. §

630.1104, "**Positive Protection Devices**" for a highway are defined as "devices that contain

and/or redirect vehicles and meet the crashworthiness evaluation criteria contained in National

Cooperative Highway Research Program (**NCHRP) Report 350**, Recommended Procedures

for the Safety Performance Evaluation of Highway Features, 1993, Transportation Research

Board, National Research Council."

30      Under 23 U.S.C.A. § 109(e), pertaining to the "Installation of Safety Devices . .

. No funds shall be approved for expenditure on any Federal-aid highway, or highway affected

under chapter 2 of this title, <u>unless proper safety protective devices complying with safety</u>

<u>standards determined by the Secretary at that time as being adequate</u> shall be installed . . . "

31      Between 1998 and 2010, the Secretary of the Department of Transportation

through the FHWA required new highway safety features to be tested according to NCHRP

Report 350.[2]  NCHRP Report 350 provides detailed requirements regarding almost every

---

[2]      After January 1, 2011 new highway safety features have been evaluated according to
the American Association of State Highway and Transportation Officials' Manual for
Assessing Safety Hardware ("MASH"); however, equipment that had previously been
approved pursuant to NCHRP was not required to be retested or certified.

parameter of the required tests including, inter alia, how the tests are to be performed, requirements for test vehicles, test conditions, and the data to be collected.

32      Under 23 CFR 637.209(a)(5), after "September 24, 2009, laboratories that perform crash testing for acceptance of roadside hardware by the FHWA shall be accredited by a laboratory accreditation body that is recognized by the National Cooperation for Laboratory Accreditation (NACLA), is a signatory to the Asia Pacific Laboratory Accreditation Cooperation (APLAC) Mutual Recognition Arrangement (MRA), is a signatory to the International Laboratory Accreditation Cooperation (ILAC) Mutual Recognition Arrangement (MRA), or another accreditation body acceptable to FHWA."

33      If manufacturers choose to seek FHWA acceptance and Federal-aid eligibility letters from the FHWA, the agency has set out specific guidelines for demonstrating compliance with NCHRP Report 350, as required by 23 U.S.C. § 109 and 23 C.F.R. § 630.1104, in the FHWA policy memo:  Identifying Acceptable Highway Safety Features available at http://www.fhwa.dot.gov/legsregs/directives/policy/ra.htm.

34      Submissions to the FHWA by a manufacturer seeking the FHWA's approval for a highway feature as crashworthy and acceptable for use on the National Highway System "must fully identify: a) the feature(s) tested; b) the conditions and results of the testing; and, if acceptance is being sought for any variations in design or construction details or procedures from those covered in the documentation of the testing of the feature, c) the complete design, construction, and installation details and specifications for the version(s) of the feature for which acceptance is being sought." *Id.*

35      The FHWA also requires two copies of a "high quality, reproducible, letter-size, engineering drawing or set of drawings showing all pertinent details and installation requirements of the version(s) of the feature for which acceptance is being sought are to be included with the request for acceptance." *Id.*

8

36      "The objective is to accurately report the as-built foundation conditions, test article geometry, and material characteristics of what was actually tested, not just the nominal design dimensions and specifications for the feature, which, as indicated below, should also be reported. Ideally, all materials for a test installation should be examined before they are installed to ensure that they are representative of what will actually be supplied in service, with special vigilance for elements that, while within specifications, might falsely represent performance under service conditions." FHWA Policy Memos: Identifying Acceptable Highway Safety Features, at 8.

37      Once a corporation receives approval for a roadside safety device from the FHWA, the FHWA also attaches specific conditions in its acceptance letters, including that corporations must by "certify to potential users that the hardware furnished has essentially the same chemistry, mechanical properties, and geometry as that submitted for acceptance, and that it will meet the crashworthiness requirements of the FHWA and the NCHRP Report 350."

38      FHWA approval letters also require, as a condition of acceptance, that "Any changes that may influence system conformance with [the applicable safety standard, such as NCHRP Report 350] will require a new reimbursement eligibility letter."

39      Under 18 U.S.C. 1001, "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2) makes any materially false, fictitious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, are subject to criminal penalties and fines.

40      Under the federal Transportation Act, 18 U.S.C. 1020 it is illegal to make false statements or representations or to submit or make false certifications regarding, among other

9

things, the *character or quality* of the material to be used on a federal highway or construction project that is either be submitted to the Secretary of Transportation for approval or on any project under the Federal-aid Roads Act approved July 1, 1916, (39 Stat. 355), as amended and supplemented.

41      Specifically, the Transportation Act, 18 U.S.C. 1020 provides criminal penalties and fines for a violation by any officers, agents, employees of the United States, employees of any state or territory, or "whoever, whether a person, association, firm or corporation, who *knowingly makes any false statement, false representation, or false report as to the character, quality, quantity,* or cost of the material used or to be used, or the quantity or quality of the work performed or to be performed, or the cost thereof in connection with the submission of plans, maps, specifications, contracts, or costs of construction on any highway or related project submitted for approval to the Secretary of Transportation; or whoever knowingly makes any false statement or false representation as to material fact in any statement, certificate, or report submitted pursuant to provisions of the Federal-aid Roads Act approved July 1, 1916, (39 Stat. 355), as amended and supplemented.

42      The Office of Inspector General of the federal Transportation Department and the United States Department of Justice each year prosecute dozens of violations of  18 U.S.C. 1001 and 18 U.S.C. 1020, leading to fines, criminal penalties and debarment of individuals, contractors and manufacturers providing materials to federal transportation projects.  See http://www.ltrc.lsu.edu/ltc_13/pdf/presentations/S54_Bid%20Collusion_LTC2013.pdf

43    As of 2010, the Department of Transportation identified false statements and false claims connected to transportation projects as two of the top management challenges facing the department.[3]

44    In a 2010 report, the DOT reported that "with the number of highway and transit projects receiving Federal assistance, it is imperative that the Department and Operating Administrations aggressively combat fraud, waste, and abuse. Fraud awareness education and vigilant oversight are needed to identify and prevent common fraud schemes, such as bid rigging, price fixing, product substitution, bribery and kickbacks, conflicts of interest, false statements and false claims, labor and materials overbilling, and disadvantaged business enterprise fraud. **Of particular concern are schemes that compromise safety**."

45    For example, the report describes "a Utah corporation specializing in the installation of highway safety devices was sentenced to 36 months of probation, ordered to pay a fine of $21,916, and $31,485.45 in restitution for falsifying certificates of compliance related to the installation of highway crash cushions of a FHWA-funded project. The company admitted to submitting false certificates even though it knew that the installation of these devices did not meet contract specifications." *Id.*

46    Section 106(c) of Title 23, United States Code (U.S.C.), authorizes States to assume project responsibilities for design, plans, specifications, estimates, contract awards, and inspections for projects that receive funding under Title 23, U.S.C., and are on the National Highway System (NHS), including projects on the Interstate System. The States may assume these responsibilities unless FHWA, acting under a delegation of authority from the Secretary,

---

[3]https://www.faa.gov/about/office_org/headquarters_offices/aba/media/DOT%20F Y%202011%20Management%20Challenges.pdf

determines that the assumption is not appropriate (23 U.S.C. 106(c)(1)). For non-NHS projects,

States must assume such responsibilities (23 U.S.C. 106(c)(2)).

## IV.    THE X-LITE SYSTEM



47      Defendants in their sales and marketing materials describe the X-Lite's

function as "designed to absorb or re-direct the impact errant vehicle in accordance with

NCHRP Report 350 guidelines . . . The X-Lite terminal energy of an utilizes a telescoping,

non-extruding design."   Unlike extruding designs (like the ET-Plus) the terminal head of

the X-Lite simply bolts to the blunt end of the first guardrail panel.



**Figure 1: The X-Lite Terminal Head**

48      The system consists of an impact head, two ground struts, a ground strut angle, a slider panel and slider bracket, a BCT cable (connected to the slider bracket), a " unique post" and three crimped posts. The X-Lite is sold with three 13-foot guardrail panels and was approved as a 37 ½ foot[4] system.

49      When impacted by a vehicle at the terminal head, the ground struts and the BCT cable of the X-Lite are designed to provide initial resistance to decelerate the vehicle, and then are designed to release, allowing the slider bracket and slider panel to move along the length of the guardrail.

50      The terminal head is supposed to stay in place between the blunt ends of the guardrail and the vehicle, and to push the slider bracket along the back side of the guardrail to shear off the bolts that connect the guardrail panels to the posts. The slider panel is designed to collect and hold the guardrail panels together so that – once released from the bolts by the slider bracket – all guardrail panels will theoretically stay together and move down the rail together. In its literature, Lindsay refers to the operation of the slider bracket, slider panel and guardrail as "telescoping" and "nesting" the guardrail. The nesting function is important to prevent the guardrail from elbowing and turning into a spear that pierces the vehicle and maims or kills drivers or passengers.

## V.      DEFENDANTS' FALSE CLAIMS AND FRAUDULENT OMISSIONS TO OBTAIN APPROVAL FOR THE X-LITE FOR USE ON FEDERALLY FUNDED HIGHWAYS.

51      Defendants in a letter dated December 20, 2010 ("December 2010 Letter") submitted drawings and crash test reports for the X-Lite to the FHWA for approval of the

---

[4]      Because the guardrail panels are overlapped about 6 inches where they meet and are bolted together at posts, the effective length of each panel is about 12.5 feet.

X-Lite system for use on the National Highway System (NHS) by the Federal Highway Administration (FHWA) under NCHRP Report 350.

52    The December 2010 Letter, along with its enclosures, made false claims and representations about (a) the X-Lite system that was crash tested, (b) the configuration of the X-Lite system that would be placed on the nation's roadways, and (c) the performance of the X-Lite in crash tests.[5]

53    In addition, after receiving approval from the FHWA for the X-Lite system to be placed on the NHS on September 7, 2011 ("September 2011 FHWA Approval"), sometime in 2013 Defendants made material changes to the X-Lite system without ever notifying or disclosing those changes to the FHWA, the states, or contractors.

54    Specifically, Defendants made undisclosed changes including (1) a new slider panel, (2) a 10-inch bolt through Post #7, and (3) the sale of an unapproved 50-foot X-Lite system, when only a 37.5-foot system had been approved by the FHWA and accepted for use on the NHS in approval letter cc120.

## VI.    THE UNDISCLOSED CHANGES.

### A. THE SLIDER PANEL

55    The slider panel, as shown below, has a front and back section that are bolted together through brackets at the top and bottom of the slider panel, wrapping the guardrail front-to-back.

---

[5]    All of the 2010 crash testing submitted to the FHWA for approval of the X-Lite was conducted by Safe Technologies, Inc., a wholly owned subsidiary of Lindsay.



**Figure 2: Slider Panel, Front Side (Left) and Back Side (Right). The Slider Bracket is also shown in the photo on the right.**

56     As the slider panel is pushed down the rail by the vehicle, the slider panel is designed to gather (or telescope) the guardrail until the vehicle is stopped. If it works correctly, the X-Lite's slider panel gathers or captures all of the panels of the guardrail in its grip, shielding a vehicle from potentially fatal contact with the blunt end of a guardrail panel.

57     The slider panel used by Lindsay in the X-Lite since 2013 is not the slider panel that was used in the crash testing in 2010.

58     Sometime in 2013 Lindsay made undisclosed changes to the slider panel by welding an additional 1.5 inches of hot-rolled steel to the right (impact) side of the slider panel. The slider panel is shown in the comparison photos below. The version used in 2013 is on the left and the version used after 2014 is on the right.



59      The version of changed Front Slider Panel used after 2013 is more similar to the design included in the slider panel patent filed in 2008 and issued in 2011. See Figure 3, below.



**Figure 3: Slider Panel drawing from 2008/2011 patent**

60      Since the change to the slider panel there have been documented accidents in which the altered slider panel has apparently snagged, causing the slider panel to hinge and spear a vehicle. There have been fatal spearing accidents in Massachusetts, Missouri

and Tennessee that have involved X-Lite installations that have used the sliding bracket with undisclosed changes.



Figure 2: Fatal crash involving the altered Slider Panel

## B. **BOLT CONFIGURATION**

### LINDSAY TESTED A DIFFERENT BOLT CONFIGURATION THAN THE ONE DISCLOSED TO THE FHWA AND SOLD TO STATES.

57.     The bolt configuration of the X-Lite sold by Lindsay since 2011 is different than the bolt configuration crash tested in 2010 and disclosed to the FHWA in 2010 in order to obtain approval to sell the X-Lite as part of the Federal Highway program.

58.     As detailed below, all tangent crash tests run on the X-Lite by Lindsay were run using a 10-inch bolt attaching Post 7 to the guardrail. Yet this is not the bolt configuration reported by Lindsay to the FHWA in their tangent drawing, below, which shows only **8 shear bolts** at Post 7, and **no bolt to the post**.

17



**FHWA DRAWING**

*Figure 3: FHWA Drawing Submitted for Approval in 2010 shows only 8 shear bolts at Post 7, and no Post bolt.*

59      The shear bolts simply fasten two pieces of guardrail together where the guardrail ends meet at Post 5 and Post 7 – the shear bolts **do not** attach the guardrail to the posts.  Only a post bolt, such as the 10-inch bolt used in the crash testing, attaches the guardrail to the posts.  Furthermore, the shear bolts are designed to "fail" under pressure, such as when a car hits the end of the terminal, theoretically allowing the guardrail to slide and nest within the slider panel as the car pushes it down the rail.

### a. The X-Lite Patent Warns that a 10-inch Bolt Attaching the Guardrail to Post 7 is Critical to the X-Lite's Performance.

60      The patent for the X-Lite states that a single (10-inch) bolt attaching the guardrail to Post 7 is necessary for safety purposes on the X-Lite whenever two sets of shear bolts are used on the system.  When one set of shear bolts is used at Post 5 and

18

another set of shear bolts is used at Post 7, as it is in the tangent X-Lite, the patent states

that it is "impossible to control the order in which the sets of shear bolts [will] fail" unless a

10-inch post bolt is used at Post 7.

**4**

As noted in the above background art discussion the inventor had previously found it critical to only have one set of shear bolts (the first set—shown by the arrow marked 1") connecting rails 2 and 3 as it was found if other sets of shear
5   bolts were used to connect downstream rails such as rails 3 and 4 (the second set — shown by the arrow marked 2"") it was impossible to control the order in which the sets of shear bolts would fail. In some instances the 1" and 2"" set could fail simultaneously, or the 2"" set could fail before the first set,
10   typically both mis-events being triggered as the impact head 1000 on the downstream end of the first rail (rail 1) impacted with the upstream end of the second rail (rail 2). However, with the guardrail configured as shown in FIG. 1 the order in which the sets of shear bolts fails is controlled so the 1" set fails
15   before the 2"" set. The 2"" set failing when the impact head 1000 impacts with the upstream end of the third rail (rail 3) during telescoping of the rails. The impact head 1000 impacting with the upstream end of the rails can also trigger additional upstream joints to fail sequentially depending on the
20   force to be absorbed and length of rails.

Thus, given these difficulties with controlling with certainty the sequential order in which the sets of shear bolts need to fail resulted in prior art guardrails only having one set of shear bolts being employed.
25   The present invention as shown in FIG. 1 has now overcome this problem and allows a greater amount of controlled telescoping to occur and enables more energy to be absorbed during head on impact situations.

In FIG. 4 there is shown a shear bolt 6 which is around 35
30   mm in length and which has a head 6a and a shaft 6b. A v-shaped notch 6c circumscribes the shaft 6b adjacent where it joins the head 6a. By way of comparison a standard post bolt is around 240-250 mm in length depending on whether it is screwed into the support block 200 shown in FIG. 1 or
35   whether it passes through the support block 200 to effectively connect the rails to the support post 20 via engaging a nut.

**From the Patent applied for in 2012, issued in 2015.**

Prior art had found it "critical to only have one set of shear bolts . . . as it was found if other sets of shear bolts were used to connect downstream rails such as rails 3 and 4 . . . it was impossible to control the order in which the sets of shear bolts would fail."

"However, with the guardrail configured as shown in FIG 1 [with shear bolts at Post #5 and no 10-inch post bolt, but with shear bolts and a 10-inch post bolt at Post #7] the order in which the sets of shear bolts fail is controlled so the 1st set fails before the 2nd set."

"The present invention . . . has now overcome this problem and allows a greater amount of controlled telescoping to occur . . ."

61    Defendants used a 10-inch bolt at Post 7 in their 2010 Crash tests, as shown

in the third photo below, but Defendants omitted this bolt in their drawing supplied to the

FHWA (see Figure 3, above), and then failed to supply a 10-inch bolt or to apprise states or

contractors that a 10-inch bolt is needed at Post 7. See photo from Defendants' installation

manual below (middle photo).


**Patent Drawing of Post 7 Bolts**


Shear Bolts at Rail 3 and 4 Connection
**Post 7 in Installation Manual**


**Crash-tested Post 7**

62      Defendants have maintained since 2011 in their installation manuals and even in "installation audits" conducted by state DOTs, that **no post bolt** is required for the tangent X-Lite at Post 7, despite the fact that Defendants' crash tests were conducted with a bolt at Post 7, and despite the fact that Lindsay's own patent states that X-Lites without this post bolt are dangerous:

> "In some instances [without the 10-inch bolt at Post 7] the 1st and 2nd set [of shear bolts] could fail simultaneously, or the 2nd set could fail before the first set, typically both mis-events being triggered as the impact head on the downstream end of the first rail . . . impacted with the upstream end of the second rail . . ."

> X-Lite Patent.

63      Defendants have never disclosed to the FHWA (a) that the tangent X-Lite for which they obtained approval in 2011, is materially different due to the bolt configuration than the actual tangent X-Lite that was crash tested, (b) that the tangent X-Lite needs a 10-inch Post bolt at Post 7 in order to operate safely, as confirmed by their patent, and (c) that Defendants never crash tested the bolt configuration (with no 10-inch post bolt at Post 7) on the X-Lite that Defendants sought to have approved in 2011.

## C. LENGTH OF THE SYSTEM

64      There are several issues pertaining to the length of the X-Lite system. **First**, the FHWA expressly accepted the X-Lite in 2011 as a 37.5-foot system. This acceptance

came despite the fact that the tangent 3-31 crash test demonstrated that the system needs at least 62 feet to safely stop a pickup truck. This was not highlighted in the crash test reports.

65    **Second**, the installation manuals for the X-Lite system, beginning in 2011, instruct that the system should be attached to "existing guardrail" without specifying the minimum length needed for the "existing guardrail." Lindsay also marketed the X-Lite as a 37.5-foot system that could be attached directly to a concrete barrier, without ever disclosing to states that the X-Lite needed at least 62-feet to bring a pickup truck to a controlled stop.

FREQUENTLY ASKED QUESTIONS

What makes the X-LITE Terminal different from the other redirective, gating terminals on the market?
The X-LITE Terminal utilizes a telescoping, non-extruding design to provide safe and consistant performance. The X-LITE Terminal is also engineered with maximum interchangeability between flared and tangent roadside applications. Lastly, The X-LITE Terminal is engineered using simple design and standard guardrail components that can be procured in kit or system form.

Can the X-LITE Terminal be attached to concrete barrier?
Yes, The X-LITE Terminal can be attached to concrete barrier with the addition of standard transitions.

66    **Third,** in or about 2014 Defendants began to market a 50-foot X-Lite system without ever seeking approval for the longer system from the FHWA. The longer system has features, including the modified slider panel and a 10-inch bolt at Post 7, that were never disclosed to the FHWA or to the state Departments of Transportation and never approved when Defendants' sought funding eligibility for the X-Lite.

## VII.    DEFENDANTS FALSE CLAIMS TO THE STATES

67    Yet, even after making these secret changes, Defendants continued to sell the X-Lite for use on the NHS and state highways, and to falsely certify to states and

contractors that the X-Lite Defendants were selling was the exact same X-Lite that had been approved by the FHWA.

68    This was in violation of the terms of Defendants' September 2011 FHWA Approval letter, which specifically required that Defendants "certify to potential users that the hardware furnished has essentially the same chemistry, mechanical properties, and geometry as that submitted for acceptance, and that it will meet the crashworthiness requirements of the FHWA and the NCHRP Report 350."

69    On March 6, 2013, Defendants sought FHWA approval for a change that consisted of the addition of an aluminum clip to the cable attachment at post number 2 of the X-Lite system.  To prove this change would have either no change or a positive change on the performance of the X-Lite Defendants ran a bogie test on Post 2 with the aluminum clip.

70    In their March 6, 2013 letter to the FHWA, Defendants again fraudulently omitted any reference to the fact that the original drawings submitted to the FHWA of the X-Lite system were not an accurate portrayal of the system that was crash tested in 2010. Nor did Defendants notify the FHWA of the undisclosed changes they had made to the system since its approval in 2011.

71    The March 29, 2013 approval letter (cc120a) from the FHWA required that "Any changes that may influence system conformance with MASH[6] will require a new reimbursement eligibility letter."

72    The March 29, 2013 letter also required that Defendants "certify to potential users that the hardware furnished has the same chemistry, mechanical properties, and

---

[6]    THE FHWA most likely meant to require compliance under NCHRP Report 350 rather than MASH since the X-Lite was originally tested under NCHRP Report 350.

geometry as that submitted for review, and that it will meet the test and evaluation criteria of the MASH."[7]

73     In a July 16, 2013 letter, Defendants again sought approval for a change to the X-Lite system, this time to the soil plate.  In that letter, Defendants again failed to disclose the other changes made to the X-Lite system, or to seek approval for those changes.

74     Once again, the FHWA reminded Defendants that "Any changes that may influence system conformance with MASH[8] will require a new reimbursement eligibility letter."

75     The January 28, 2014 approval letter from the FHWA also required that Defendants "certify to potential users that the hardware furnished has the same chemistry, mechanical properties, and geometry as that submitted for review, and that it will meet the test and evaluation criteria of the MASH."[9]


## VIII.  DEFENDANTS' FRAUDULENT CRASH TESTING.

76     Defendant Safe Technologies, Inc., which is a wholly owned subsidiary of Defendant Lindsay Corporation and Barrier Systems, performed all of the crash testing on the X-Lite end terminal.

---

[7]     See Footnote 4, above.
[8]     THE FHWA most likely meant to require compliance under NCHRP Report 350 rather than MASH since the X-Lite was originally tested under NCHRP Report 350.
[9]     See Footnote 6, above.

77    At the time Defendants performed the crash testing, the FHWA did not require either third party certification or independent verification of crash testing.

78    Safe Technologies manager, Jacob Ruskofsky, who supervised the crash testing of the X-Lite and signed the crash test reports, was at the time the X-Lite was tested simultaneously acting as the design and applications engineer for Barrier Systems in charge of research and development projects. Mr. Ruskofsky was also in charge of assuring on behalf of Barrier Systems, that "necessary guidelines for certification were met during crash testing."[10]

79    The crash tests submitted for acceptance by the FHWA of the X-Lite were conducted between September and December of 2010, and the crash test reports and results sent to the FHWA were dated December 20, 2011 and received by the FHWA on December 27, 2010. The timing is significant because the FHWA announced in 2009 that any first-time submissions of highway safety devices after January 1, 2011 were to be tested and reviewed under the much more rigid MASH standards.

80    This is also significant because the deadline for NCHRP Report 350 testing as of the end of 2010 increased the pressure on Lindsay and Safe Technologies to submit the X-Lite crash testing prior to the January 1 deadline, leaving little or no time to repeat crash tests for any design changes that may have been recommended by their engineers based upon the results of the crash tests.

A.    Defendants' representations in the crash test reports about the outcome of the crash tests, in some cases directly contradict the results shown in the actual crash test videos.

---

[10]    Linked-In Job Description of Jacob Ruskofsky. https://www.linkedin.com/in/jacob-ruskofsky-p-e-4a5112a2/ (last visited January 20, 2018).

81    In the report for tangent crash test 3-30 (the small car), for instance,

Defendants falsely contend that:

> [T]he vehicle bumper came to bear against the impact head which caused
> the article to start telescoping. <u>The system continued to telescope[11] until the
> first three guardrail panels nested</u> which sheared the shear bolts at post # 7
> allowing the three guardrail panels to release and fall to the ground on the
> front side of the system. This action allowed the vehicle to travel to the back
> side of the system and come into contact with several guardrail posts which
> caused the vehicle to yaw out.

The first three guardrail panels did not telescope and nest, nor did they shear the

shear bolts at post #7.  Instead the head and the guardrail panels detached when the

car rode up on the guardrail between post 6 and post 7.



---

[11]    The report does not define "telescoping", but it is defined in the dictionary as "to
slide or cause to slide into itself, so that it becomes smaller."



*Figure 4 This photo shows that any telescoping or nesting stopped before Post 5 and that the shear bolts at Post 5 never sheared.*



B.  Shear Bolts at Post 9 in the 3-31 Tangent Crash Test.

82      There are other indications that different bolts were used than disclosed in the crash test report and that guardrail was moved or rearranged after certain crash tests.

83      Defendants claimed to use only two sets of shear bolts in test 3-31, at Posts 5 & 7, but comparing test 3-31 to 3-30 (where shear bolts were used at Posts 5, 7, & 9), it appears 3-31 also used shear bolts at Post 9.

84      Post 9 in the 3-30 test is shown below with shear bolts.



**Similarly the bolts at Post 9 in the 3-31 crash test, below, appear to be identical to the yellow bolts used in the 3-30 crash test.**



**THE FOLLOWING PHOTO IS ALSO FROM THE TANGENT 3-31**

**INSTALLATION**



**BUT COMPARE WITH THE BOLTS ON THE FLARED POST #9 IN THE 3-31 CRASH TEST BELOW (WHERE THERE WERE NO SHEAR BOLTS):**



85      Furthermore sheared yellow bolts were photographed next to Post 9 after the

3-31 crash test.

**THE TRUCK STOPPED JUST BEFORE POST 10 (below).**



**YELLOW SHEAR BOLTS WERE PHOTOGRAPHED JUST UNDER THE TRUCK NEXT TO POST #9 AFTER THE TRUCK CAME TO A STOP (SEE BELOW)**



C.  There is also evidence that undisclosed shear bolts were used at Post 3 in the 3-31 crash test under the Slider Bracket.

In the 3-31 crash test, the slider bracket stopped at Post #12 – along with Guardrail Panel #1.  See Yellow paint in bolt holes, indicating yellow shear bolts were used.



Further evidence that these shear bolts were secretly attached under the slider panel, is that the guardrail panel is marked "Panel 1", which is the guardrail panel that was attached to the slider panel.



THE PANEL IS MARKED
PANEL 1 THAT WENT
FROM POST 1 TO POST 3



D. Unexplained variations in photos of the bolt in the guardrail panel resting at Post 11 after the 3-31 Crash Test, raises questions about the integrity of the post-crash photographs.

86      There is also evidence that guardrail panels were moved or rearranged after the 3-31 crash testing.

87      For instance, photographs of the guardrail that was at Post 11 in the 3-31 crash test (and was probably originally attached to Post 10) indicate the guardrail was rearranged after the test.

88      As shown below, the bolt inexplicably changes location between photos. In some photos the bolt in the guardrail is on the right side of the opening, while in others it is on the left. In most photos there is an opening to one side or the other of the bolt, but in one photo there is no opening next to the bolt.

31

For instance, below the bolt is on the right side of the opening.



The bolt below is on the left and metal is obscuring the opening.



While below, the bolt is on the left and there is no metal obscuring the opening.



The bolt below is on the right side of the opening.



## IX.   DEFENDANTS KNOWINGLY MADE FALSE STATEMENTS.

89    Defendants knowingly and deliberately deceived the FHWA with their false

statements as detailed above concerning the characteristics, crash testing and configuration

of the X-Lite end terminal in order to obtain FHWA approval for the X-Lite pertaining to

33

eligibility for federal funds when used on any state or federally funded highway, including the National Highway System. Defendants' false statements were also designed to fraudulently lead the FHWA to conclude that the X-Lite met NCHRP Report 350 crash test criteria, when Defendants knew that the X-Lite did not meet these standards. Moreover, Defendants knew when they changed the X-Lite that they were required to report those changes to the FHWA and to state Departments of Transportation, but Defendants failed to make any such disclosures.

90     Furthermore, all state Departments of Transportation ("DOTs") maintain Qualified Products Lists ("QPLs") or Approved Products Lists ("APLs") for products that have been tested and approved for use in highway and road construction in compliance with federal and state regulations.

91     In order for a manufacturer to get its guardrail end terminal placed on a state's QPL or APL, the company must expressly certify to the state Department of Transportation that the product has been deemed eligible for federal funding by the FHWA and that the product is has been crash-tested and found to meet the standards of NCHRP Report 350.

92     Furthermore, when supplying the product for use on federal or state highways, manufacturers must expressly certify to contractors and state Departments of Transportation that the product that is being supplied is the same product that has been found eligible for Complaint and previously found to be crashworthy under NCHRP Report 350.

93     Defendants made false statements to each state's Department of Transportation, certifying (a) that the X-Lite end terminal Defendants were selling had been properly crash tested under NCHRP Report 350 and (b) that the X-Lite Defendants'

were selling was the same X-Lite disclosed to the FHWA in order to obtain a federal-highway-aid eligibility letter for the X-Lite.   These statements were false and Defendants were aware they were false at the time they made these statements.

94      Each time that Defendants provided the X-Lite end terminal for use on a state or federal project on the Interstate Highway System, Defendants also violated 18 U.S.C. 1020, by knowingly making "false statement[s], false representation[s], or false report[s] as to the character [and] quality" of the X-Lite since they were falsely representing the X-Lite as, among other things, that (a) the same terminal that had been found eligible under FHWA approval letter cc120, (b) the X-Lite terminal was NCHRP Report 350 compliant, when Defendants were aware that the secretly changed X-Lite terminal they were selling had never been tested under NCHRP Report 350, and (c) the X-Lite terminal was safe for use on the highways, when their own patent demonstrated that the X-Lite terminal was unsafe without a 10-inch bolt at Post #7 and Defendants sold the X-Lite without requiring or explaining to users that the X-Lite required such a bolt.

## X.     DEFENDANTS' FALSE STATEMENTS AND OMISSIONS ARE MATERIAL.

95      Defendants were well aware that their false statements were material to decisions by state DOTs and the federal government to pay for the X-Lite end terminals.

96      Defendants voluntarily sought an FHWA acceptance letter under NCHRP Report 350 the rules set out by the FHWA but violated the rules by submitting false results, by running the crash tests with a different version of the X-Lite than Defendants disclosed to the FHWA, and by selling a different version – with undisclosed, secret changes – that had never been approved by the FHWA or disclosed to state DOTs.

97      Defendants also violated the specific terms of their "Eligibility Letter cc120" and its progeny by failing to apprise users that the X-Lite they were selling was not essentially the

same character and quality that the FHWA had been led to believe it was approving in Letter cc120.

98      Such deceit and false statements about the quality and character of highway transportation goods have not only resulted in non-payment by the government, but routinely results in debarment, criminal penalties and fines. See e.g.

https://www.faa.gov/about/office_org/headquarters_offices/aba/media/DOT%20FY%202011%2
0Management%20Challenges.pdf

## XI.    DEFENDANTS CAUSED FALSE CLAIMS FOR PAYMENT TO BE MADE.

99      Defendants have caused thousands of false claims to be submitted for payment, resulting in millions of dollars in federal and state funds paid out to Defendants and to contractors for installation.

100     For instance, the attached Exhibit C, is a 2016 invoice #123201 to the state of North Carolina DOT for $2,050.00 for the purchase a single X-Lite terminal.

101     Exhibit D is an invoice dated October 8, 2016 for three X-Lite terminal heads, at $3,194 each to be used at an intersection with I-190 in Grand Island, New York.

102     Exhibit A is a letter from the Tennessee Department of Transportation to the FHWA, explaining that TDOT is removing more than 2,600 X-Lite terminals from its roads that were purchased in reliance upon the FHWA issued acceptance letter.

### CLAIMS FOR RELIEF

### COUNT 1

Federal False Claims Act:  Presentation of False Claims
(31 U.S.C. § 3729(a)(1))

96.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

97.     By virtue of the acts alleged herein, Defendants, through the acts of their officers, agents, employees, and sales representatives and for the purpose of defrauding the Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under the Federal Highway Aid and other programs to officers, employees, or agents of the United States Government, in violation of 31 U.S.C. § 3729(a)(1).

98.     As a result, federal monies were lost through payments made in connection with the claims and other costs and losses were sustained by the Government, and Defendants are liable for treble damages plus the maximum civil penalty of $21,916 for each and every false and fraudulent claim made and caused to be made by Defendants and arising from their conduct as described herein.

## COUNT 2

### Federal False Claims Act:  False Statements
### (31 U.S.C. § 3729(a)(2))

99.     Relator repeats and incorporates the preceding paragraphs of this Complaint as is fully set forth herein.

100.    In performing the acts described above, Defendants, through the acts of their officers, agents, employees and sales representatives, knowingly made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the Government in violation of 31 U.S.C § 3729(a)(2).

101.    The United States, unaware of the foregoing circumstances and conduct of Defendants, made full payments, and Defendants are liable for treble damages plus the maximum civil penalty of $21,916 for each and every false and fraudulent claim made and caused to be made by Defendants and arising from their conduct as described herein.

## COUNT 3

### Federal False Claims Act:  Conspiracy to Violate the False Claims Act
### (31 U.S.C. § 3729(a)(3))

102.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 124  of this Complaint as if fully set forth herein.

103.    By virtue of the acts alleged herein including the fraudulent crash testing, joint marketing, and fraudulent omissions regarding the changes made by Defendants, Defendants knowingly entered into a conspiracy to defraud the Government by getting a false or fraudulent claim allowed or paid, and agreed that the false records or statements would have a material effect on the Government's decision to pay the false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(3).

104.    As a result, federal monies were lost through payments made, and Defendants are liable for treble damages plus the maximum civil penalty of $21,916 for each and every false and fraudulent claim.

## COUNT 5

### California False Claims Act
### (Cal. Gov't Code § 12650 et seq)

105.    Relator repeats and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

106.    This is a claim for penalties and treble damages for violation of the California False Claims Act.

107.    By virtue of the acts described above, Defendants, for the purpose of defrauding the California State Government, knowingly presented and/or caused to be presented false claims for payment or approval under the Federal Highway Aid program, the state Transportation Aid

program and other California State-funded programs to officers or employees of the state within the meaning of Cal. Gov't Code § 12651(a)(1).

108.   By virtue of the acts described above, Defendants, for the purpose of defrauding the California State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved within the meaning of Cal. Gov't Code § 12651(a)(2).

109.   The California State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

110.   As a result, California State monies were lost through payments made because of the claims, and other costs and losses were sustained by the California State Government.

111.   Therefore, the California State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

112.   Additionally, the California State Government is entitled to the maximum penalty of $21,916 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

**COUNT 6**

Florida False Claims Act
(Fla. Stat. § 68.082 *et seq.*)

113.   Relator repeats and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

114.   This is a claim for penalties and treble damages under the Florida False Claims Act.

115.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Florida State Government, knowingly presented and/or caused to be presented false claims

for payment or approval under the Complaint program, the state Transportation Act, and other Florida State-funded programs to officers or employees of the state within the meaning of Fla. Stat. § 68.082(2)(a).

116.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Florida State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved within the meaning of Fla. Stat. § 68.082(2)(b).

117.    The Florida State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

118.    As a result, Florida State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Florida State Government.

119.    Therefore, the Florida State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

120.    Additionally, the Florida State Government is entitled to the maximum penalty of $21,916 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

### COUNT 7

#### Georgia Taxpayer Protection False Claims Act
#### (Ga. Code Ann. § 23-3-120 *et seq.*)

121.    Relator repeats and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

122.    This is a claim for penalties and treble damages under the Georgia State False Federal Highway-Aid program Claims Act.

123.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Georgia State Government, knowingly presented and/or caused to be presented to the Georgia Federal Highway-Aid program program false or fraudulent claims for payment or approval within the meaning of Ga. Code Ann. § 23-3-120 *et seq.*

124.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Georgia State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved through the Complaint program, the Georgia Transportation Aid program, and other state programs within the meaning of Ga. Code Ann. § 23-3-120 *et seq*

125.    The Georgia State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

126.    As a result, Georgia State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Georgia State Government.

127.    Therefore, the Georgia State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

128.    Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim presented or caused to be presented by Defendants and arising from their conduct as described herein.

### COUNT 8

Maryland False Claims Act
(Md. Gen. Code § 8-101 *et seq.*)

129.    Relator repeats and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

130.    This is a claim for a fine and damages under the Maryland False Claims Act.

41

131.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Maryland State Government, knowingly engaged in misrepresentations to obtain, or attempt to obtain, payment from medical assistance program funds within the meaning of Md. Gen. Code 8-101 et seq).

132.    The Maryland State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

133.    As a result, Maryland State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Maryland State Government.

134.    Therefore, the Maryland State Government has been damaged in an amount to be proved at trial.

135.    Additionally, the Maryland State Government is entitled to the maximum civil penalties, the maximum fine in the amount of three times the amount of actual damages sustained as a result of the violations described herein. Md. Gen. Code 8-101

## COUNT 9

### Massachusetts False Claims Act
### (Mass. Gen. L. Ch. 12, § 5 et seq.)

136.    Relator repeats and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

137.    This is a claim for penalties and treble damages under the Massachusetts False Claims Act.

138.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Massachusetts Commonwealth Government, knowingly made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth within the meaning of Mass. Gen. L. Ch. 12, § 5B.

42

139.    The Massachusetts Commonwealth Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

140.    As a result, Massachusetts Commonwealth monies were lost through payments made because of the claims, and other costs and losses were sustained by the Massachusetts Commonwealth Government.

141.    Therefore, the Massachusetts Commonwealth Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

142.    Additionally, the Massachusetts Commonwealth Government is entitled to the maximum penalty of $21,916 for each and every false or fraudulent claim paid or approved arising from the Defendants' conduct as described herein.

## COUNT 10

### Minnesota False Claims Act
### (Minn. Stat. § 15C.01 *et seq.*)

143.    Relator repeats and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

144.    This is a claim for penalties and treble damages under the Minnesota False Claims Act.

145.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Minnesota Government, knowingly made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the Minnesota Government within the meaning of Minn. Stat § 15C.01.

146.    The Minnesota Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

43

147.    As a result, Minnesota monies were lost through payments made because of the claims, and other costs and losses were sustained by the Minnesota Government.

148.    Therefore, the Minnesota Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

149.    Additionally, the Minnesota Government is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim paid or approved arising from the Defendants' conduct as described herein as well.


## COUNT 11

### New Jersey False Claims Act
### (N.J.S.A. § 2A:32C-1 *et seq.*)

150.    Relator repeats and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

151.    This is a claim for penalties and treble damages under the New Jersey False Claims Act.

152.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New Jersey State Government, knowingly presented and/or caused to be presented false claims for payment under the Complaint program, the New Jersey Transportation Ac, and other New Jersey State-funded programs within the meaning of N.J.S.A. § 2A:32C-2.

153.    The New Jersey State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

154.    As a result, New Jersey State monies were lost through payments made because of the claims, and other costs and losses were sustained by the New Jersey State Government.

155.    Therefore, the New Jersey State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

156.    Additionally, the New Jersey State Government is entitled to the maximum penalty under N.J.S.A. § 2A:32C-3 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

## COUNT 12

### New York False Claims Act
### (N.Y. State Fin. Law § 189(1)(a)-(b) et seq)

157.    Relator repeats and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

158.    This is a claim for penalties and treble damages under the New York False Claims Act.

159.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New York State Government, knowingly presented and/or caused to be presented false claims for payment or approval the Complaint program, New York's Transportation Aid program, and other New York State-funded programs to officers or employees or agents of the state within the meaning of N.Y. State Fin. Law § 189(1)(a).

160.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New York State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved within the meaning of N.Y. State Fin. Law § 189(1)(b).

161.    The New York State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

162.    As a result, New York State monies were lost through payments made because of the claims, and other costs and losses were sustained by the New York State Government.

163.    Therefore, the New York State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

164.    Additionally, the New York State Government is entitled to the maximum penalty of $12,000 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

46

## COUNT 13

### North Carolina False Claims Act
### (N.C.G.S.A. § 1-605 *et seq.*)

165.    Relator repeats and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

166.    This is a claim for penalties and treble damages under the North Carolina False Claims Act.

167.    By virtue of the acts described above, Defendants, for the purpose of defrauding the North Carolina State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Federal Highway-Aid program and other North Carolina State-funded programs to officers or employees of the state within the meaning of N.C.G.S.A. § 1-606.

168.    The North Carolina State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

169.    As a result, North Carolina State monies were lost through payments made because of the claims, and other costs and losses were sustained by the North Carolina State Government.

170.    Therefore, the North Carolina State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

171.    Additionally, the North Carolina State Government is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

## COUNT 14

### Rhode Island State False Claims Act
### (Gen. Laws 1956, § 9-1.1-1 et seq)

172.    Relator repeats and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

173.    This is a claim for penalties and treble damages under the Rhode Island State False Claims Act.

174.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Rhode Island State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Federal Highway-Aid program, the Rhode Island Transportation Aid program, and other Rhode Island State-funded programs to officers or employees of the state within the meaning of Gen. Laws 1956, § 9-1.1-3.

175.    The Rhode Island State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

176.    As a result, Rhode Island State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Rhode Island State Government.

177.    Therefore, the Rhode Island State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

178.    Additionally, the Rhode Island State Government is entitled under Gen. Laws 1956, § 9-1.1-3 to the maximum penalty of $21,916 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

### COUNT 15

Tennessee False Claims Act
(Tenn. Code Ann. § 4-18-101 et seq)

179.    Relator repeats and incorporates the preceding paragraphs of the Complaint as if fully set forth herein.

48

180. This is a claim for penalties and treble damages under the Tennessee False Claims Act.

181. By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Federal Highway-Aid program, the Tennessee Transportation Aid program, and other Tennessee State-funded programs to officers or employees of the state within the meaning of Tenn. Code Ann. § 4-18-103(a)(1).

182. By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved within the meaning of Tenn. Code Ann. § 4-18-103(a)(2).

183. The Tennessee State Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

184. As a result, Tennessee State monies were lost through payments made because of the claims, and other costs and losses were sustained by the Tennessee State Government.

185. Therefore, the Tennessee State Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

186. Additionally, the Tennessee State Government is entitled to the maximum penalty of $21,916 for each and every false claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

## COUNT 16

### Virginia Fraud Against Taxpayers Act
### (Va. Code Ann. § 8.01-216 et seq.)

187.    Relator repeats and incorporates all of the preceding paragraphs of the Complaint as if fully set forth herein.

188.    This is a claim for penalties and treble damages under the Virginia Fraud Against Taxpayers Act.

189.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Virginia Commonwealth Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Federal Highway-Aid program, the Commonwealth Transportation Aid program, and other Virginia Commonwealth-funded programs to officers or employees of the Commonwealth within the meaning of Va. Code Ann. § 8.01-216.3(A)(1).

190.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Virginia Commonwealth Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth under Federal Highway-Aid program and Virginia Commonwealth-funded programs within the meaning of Va. Code Ann. § 8.01-216.3.

191.    The Virginia Commonwealth Government, unaware of the falsity, paid claims that it would not have paid had it known of Defendants' practices.

192.    As a result, Virginia Commonwealth monies were lost through payments made because of the claims, and other costs and losses were sustained by the Virginia Commonwealth Government.

193.    Therefore, the Virginia Commonwealth Government has been damaged in an amount to be proved at trial and is entitled to treble damages as permitted by statute.

194.    Additionally, the Virginia Commonwealth Government is entitled to the maximum penalty of $21,916 for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their conduct as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for the following relief:

A.    Judgment in an amount equal to treble the damages to be proved at trial against Defendants and in favor of the United States, plus a civil penalty of up to $21,916 for each violation of 31 U.S.C. § 3729 proved at trial;

B.    Judgment in an amount equal to treble the damages to be proved at trial against Defendants and in favor of the State of California, plus a civil penalty of $21,916 for each violation of Cal. Gov't Code § 12651 proved at trial;

C.    Judgment in an amount equal to treble the damages to be proved at trial against Defendants and in favor of the State of Florida, plus a civil penalty of $21,916 for each violation of Fla. Stat. Ann. § 68.082 proved at trial;

D.    Judgment in an amount equal to threefold the damages to be proved at trial against Defendants and in favor of the State of Georgia, plus a civil penalty of $11,000 for each violation of Ga. Code Ann. § 49-4-168.1 proved at trial;

E.    Judgment in an amount equal to treble the damages plus penalties to be proved at trial against Defendants and in favor of the State of Maryland;

F.    Judgment in an amount equal to threefold the damages to be proved at trial against Defendants and in favor of the Commonwealth of Massachusetts, plus a civil penalty of $21,916 for each violation of Mass. Gen. L. Ch. 12, § 5B proved at trial;

51

G.    Judgment in an amount equal to treble the damages to be proved at trial against Defendants and in favor of the State of Minnesota, plus a civil penalty of $21,916 for each violation of Minn. Stat § 15C.01 proved at trial;

H.    Judgment in an amount equal to treble the damages to be proved at trial against Defendants and in favor of the State of New Jersey, plus a civil penalty of $21,916 for each violation of N.J.S.A. § 2A:32C-2 proved at trial;

I.    Judgment in an amount equal to treble the damages to be proved at trial against Defendants and in favor of the State of New York, plus a civil penalty of $12,000 for each violation of N.Y. State Fin. Law § 189 proved at trial;

J.    Judgment in an amount equal to treble the damages to be proved at trial against Defendants and in favor of the State of North Carolina, plus a civil penalty of $11,000 for each violation of N.C.G.S.A. § 1-606 proved at trial.

K.    Judgment in an amount equal to treble  the damages to be proved at trial against Defendants and in favor of the State of Tennessee, plus a civil penalty of $21,916 for each violation of Tenn. Code Ann. § Tenn. Code Ann. § 4-18-103 proved at trial;

L.    Judgment in an amount equal to treble the damages to be proved at trial against Defendants and in favor of the State of Tennessee, plus a civil penalty of $21,916 for each violation of Tenn. Code Ann. § 71-5-182 proved at trial;

M.    Judgment in an amount equal to treble the damages to be proved at trial against Defendants and in favor of the Commonwealth of Virginia, plus a civil penalty of $21,916 for each violation of Va. Code Ann. § 8.01-216.3 proved at trial;

N.    An award to Relator of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and equivalent provisions in the state statutes set forth above, including the costs and expenses of this action and reasonable attorneys' fees;

O.      All such other, further and different relief, whether preliminary or permanent, legal, general or equitable, as the Court deems just and proper.

## JURY DEMAND

Relator hereby demands a trial by Jury in this matter.

Respectfully submitted,

BOIES SCHILLER FLEXNER LLP

By:  /s/Teresa A. Monroe
       Teresa A. Monroe
       Jeffrey S. Shelly
       30 South Pearl Street
       Albany, New York 12207
       Phone: (518) 434-0600
       Fax: (518) 434-0665

*Counsel for Relator Stephen Eimers*